UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
EDUARDO GONZALEZ-ALDAMA,      :
     :
          Plaintiff,     :   Case No.: _____
     :
     -against-     :   DEMAND FOR JURY TRIAL
     :
FIBROCELL SCIENCE, INC., DOUGLAS J.  :
SWIRSKY, JULIAN P. KIRK, JOHN    :
MASLOWSKI, MARC B. MAZUR, KELVIN D.  :
MOORE, MARCUS E. SMITH, and CHRISTINE  :
ST. CLARE,     :
     :
          Defendants.     :
     :
--------------------------------------- X

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Eduardo Gonzalez-Aldama, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is an action brought by Plaintiff against Fibrocell Science, Inc. ("Fibrocell" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Fibrocell, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Fibrocell by Castle Creek Pharmaceutical Holdings, Inc. ("Castle Creek" or "Parent").

2.      On September 12, 2019, Fibrocell entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Castle Creek Merger Corp. ("Merger Sub"), a wholly-owned subsidiary of Parent, will merge with and into Fibrocell, with Fibrocell continuing as the surviving corporation and as a wholly-owned subsidiary of Parent (the "Proposed Transaction").

3.      Upon completion of the merger, Fibrocell stockholders will be entitled to receive $3.00 in cash per share of common stock (the "Merger Consideration").

4.      On October 11, 2019, in order to convince Fibrocell public common stock shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) critical financial projections, specifically free cash flows for the Company; (ii) the valuation analyses performed by its financial advisor, Canaccord Genuity Group Inc. ("Canaccord Genuity"); and (iii) the substance of the confidentiality agreements disclosed in the *Background of the Merger*.

6.      The special meeting of Fibrocell's stockholders to vote on the Proposed Transaction will be scheduled soon since the Proposed Transaction is set to close in the fourth quarter of 2019 (the "Shareholder Vote").  Therefore, it is imperative that the material information which has been omitted from the Proxy is disclosed prior to the Shareholder Vote, so that Fibrocell's stockholders can properly exercise their corporate voting rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Fibrocell's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Fibrocell's common stock trades on the Nasdaq, which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d

Cir. 2003) (collecting cases).

## PARTIES

11.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Fibrocell common stock.

12.    Defendant Fibrocell is a public company incorporated under the laws of Delaware with principal executive offices located at 405 Eagleview Blvd. Exton, Pennsylvania 19341. Fibrocell's common stock is traded on the Nasdaq under the ticker symbol "FCSC."

13.    Defendant Douglas J. Swirsky is, and has been at all relevant times, a director of the Company and Chairman of the Board.

14.    Defendant Julian P. Kirk is, and has been at all relevant times, a director of the Company.

15.    Defendant John Maslowski is, and has been at all relevant times, a director of the Company.

16.    Defendant Marc B. Mazur is, and has been at all relevant times, a director of the Company.

17.    Defendant Kelvin D. Moore is, and has been at all relevant times, a director of the Company.

18.    Defendant Marcus E. Smith is, and has been at all relevant times, a director of the Company.

19.    Defendant Christine St. Clare is, and has been at all relevant times, a director of the Company.

20.    The defendants identified in paragraphs 13 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Fibrocell, the

"Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21.     Fibrocell is an autologous cell and gene therapy company, which focuses on discovering and developing therapies for diseases affecting the skin and connective tissues in the United States. The company's gene therapy product candidates include FCX-007 that is in Phase I/II clinical trials to treat recessive dystrophic epidermolysis bullosa; FCX-013, a gene therapy for localized scleroderma; and gene-therapy program that is in research phase to arthritis and related conditions. It has collaboration agreement with Intrexon Corporation for the development of FCX-007, FCX-013, and products for the treatment of chronic inflammation and degenerative diseases of human joints. The company was formerly known as Isolagen, Inc. and changed its name to Fibrocell Science, Inc. in September 2009. Fibrocell Science, Inc. was incorporated in 1992 and is based in Exton, Pennsylvania.

22.     Castle Creek is a privately held holding company that holds and invests in companies in the orphan dermatology space. Castle Creek's principle executive offices are located at 233 Mt. Airy Road, 1st Floor, Basking Ridge, NJ, 07920.

23.     Pursuant to the terms of the Merger Agreement, each share of Fibrocell common stock will be converted into the right to receive $3.00 in cash per share of common stock.

24.     On September 12, 2019, Fibrocell issued a press release announcing the Proposed Transaction, which stated in relevant part:

### Castle Creek Pharmaceutical Holdings to Acquire Fibrocell

EXTON, Pa., Sept. 12, 2019 (GLOBE NEWSWIRE) -- Fibrocell Science, Inc. (Nasdaq: FCSC), a cell and gene therapy company focused on transformational autologous cell-based therapies for skin and connective tissue diseases, today announced it has reached an agreement to be acquired

by Castle Creek Pharmaceutical Holdings, Inc. ("Castle Creek Pharmaceutical Holdings"), the parent company of Castle Creek Pharmaceuticals, LLC "Castle Creek Pharmaceuticals").

Castle Creek Pharmaceutical Holdings will acquire Fibrocell for a total consideration of approximately $63.3 million, including repayment of debt and other financial instruments, in cash. Fibrocell common stockholders will receive all-cash consideration of $3.00 per share. This offer represents a 63% premium to Fibrocell's 30-day volume weighted average price as of September 11, 2019. The transaction was approved by the Boards of Directors of both companies and is expected to close in the fourth quarter of 2019.

"Following our licensing agreement to develop and commercialize FCX-007, our experience working together on rare dermatological conditions caused us to quickly realize that Castle Creek and Fibrocell could achieve even greater synergies by combining the companies into one," said Greg Wujek, CEO of Castle Creek Pharmaceuticals. "With Castle Creek's resources, Fibrocell's gene therapy platform can be advanced into additional areas of high, unmet need – with the potential to develop multiple promising new therapies."

"We are incredibly pleased to announce this transaction, which we believe is in the best interests of both shareholders and patients," said John Maslowski, President and Chief Executive Officer of Fibrocell. "We believe that combining with Castle Creek has a strong strategic rationale, as they have the expertise and resources necessary to continue the development of both FCX-007 and FCX-013, potentially bringing these and additional novel products to patients in need."

Fibrocell's portfolio includes FCX-007, an investigational, late-stage stage gene therapy product candidate for the treatment of recessive dystrophic epidermolysis bullosa (RDEB), a congenital and progressive orphan skin disease caused by the deficiency of the protein COL7. FCX-007 is a genetically-modified autologous fibroblast that encodes the gene for COL7. By genetically modifying autologous fibroblasts ex vivo to produce COL7, culturing them and then treating wounds locally via injection, FCX-007 offers the potential to address the underlying cause of the disease by providing high levels of COL7 directly to the affected areas while avoiding systemic distribution. A Phase 3 trial was initiated recently, and if successful, a Biologics License Application (BLA) filing is expected in 2021.

The portfolio also includes FCX-013, an investigational, gene therapy candidate for the treatment of moderate to severe localized scleroderma. FCX-013 is an autologous fibroblast genetically modified using lentivirus and encoded for matrix metalloproteinase 1 (MMP-1), a protein responsible for breaking down collagen. FCX-013 is currently enrolling for the Phase 1

portion of a Phase 1/2 clinical trial.

These product candidates will augment Castle Creek Pharmaceuticals' CCP-020, an investigational, late-stage topical ointment under development for the treatment of epidermolysis bullosa simplex.

Under the terms of the agreement and plan of merger, Castle Creek Pharmaceutical Holdings will purchase all outstanding shares of Fibrocell common stock for $3.00 per share and provide repayment of outstanding debt, preferred shares and warrants as defined by their individual agreements.

The closing of the acquisition is subject to customary closing conditions, including Fibrocell stockholder approval. Upon completion of the transaction, Fibrocell will become a privately held subsidiary of Castle Creek Pharmaceutical Holdings.

Fibrocell's employees will continue as employees of the combined company on completion of the transaction. Until that time, Fibrocell will continue to operate as a separate and independent company.

Castle Creek Pharmaceutical Holdings legal counsel for the transaction is Latham & Watkins LLP. Canaccord Genuity is acting as Fibrocell's exclusive financial advisor, while Hogan Lovells US LLP is acting as its legal counsel.

**The Proxy Omits Material Information**

25.     On October 11, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Shareholder Vote is forthcoming. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

26.     First, the Proxy omits background information crucial to evaluating the fairness of the Proposed Transaction, specifically regarding its limited ability to negotiate with counterparties.

27.     The Proxy omits material information concerning "don't ask, don't waive" ("DADW") provisions, and this partial disclosure misleads shareholders. The Proxy discloses that from March 2018 through October 2018, Canaccord Genuity "contacted 25 potential counterparties." *See* Proxy at 29. Further, it discloses that the Company entered into confidentiality agreements with "nine potential strategic partners," all of which contained standstill provisions prohibiting those potential strategic partners from asking for a waiver of the prohibitions, this sort of agreement is called a DADW provision. *Id*. However, the Proxy omits whether those DADW provisions either remain in effect or have fallen away. This information is critical and material because should those DADW provisions remain in effect, then those potential strategic partners would effectively be estopped from making a superior bid to that found in the Merger Consideration. Any reasonable person would deem the fact that some of the most likely topping bidders in the marketplace may be precluded from making a superior offer as significantly altering the total mix of information made available. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999).

28.     The misleading nature of the above omission is compounded by the preclusive deal protections that are in place with Castle Creek. Within 11 days of the receipt of Castle Creek's initial offer presented on June 17, 2019, negotiations regarding exclusivity commenced, and shortly thereafter on July 15, 2019, the exclusivity agreement was signed and delivered. *Id.* at 33-34. Exclusivity was later extended and remained in place throughout most of the negotiation process. *Id.* at 37. This exclusivity severely limited the Board's ability contact other potential acquirors. While the Proxy partially discloses that four days prior to entering into the exclusivity agreement the Board contacted five potential strategic partners, the Proxy omits entirely the timing, substance, and extent of the Board's communications. This information is material to

shareholders when voting on the Proposed Transaction to determine whether the Board diligently represented shareholder interests in their attempt to obtain the best value for the Company.

29.     In sum, concerning the omission of the DADW provisions and the effects of the preclusive deal protections, it becomes impossible to determine to what extent the Company conducted market checks to gauge the interest of potential counterparties. This information is material to shareholders deciding whether to vote in favor of the Proposed Transaction because Canaccord Genuity's fairness analysis is a "pale substitute for the dependable information that a canvas of the relevant market can provide." *Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1287 (Del. 1989). Further, if the DADW provisions remained in effect, the Board's statutory and fiduciary obligations to attempt to maximize shareholder value was severely limited. *See Koehler v. NetSpend Holdings, Inc.*, C.A. No. 8373-VCG, 2013 Del. Ch. LEXIS 131, at *66-72 (Del. Ch. Ct. May 21, 2013). For these reasons, more background information must be disclosed in order to correct the misleading statements in the Proxy.

30.     Second, concerning management projections, the Proxy fails to disclose the projected free cash flows for the Company.

31.     The projected free cash flows for the company are material to shareholders as they are a critical metric when evaluating a company. Indeed, Canaccord Genuity utilized the projected free cash flows provided by management in creating their *Discounted Cash Flow Analysis*—a critical analysis when providing their opinion regarding the fairness of the Merger Consideration. *See* Proxy at 55. One of the most influential books ever to come out on investing, written by professors Benjamin Graham and David Dodd of Columbia Business School, states that as to free cash flows:

> Most value investors today analyze free cash flow. This is the cash generated
> annually from the operations of a business after all capital expenditures are made

9

and changes in working capital are considered. Investors have increasingly turned
to [free cash flows] because reported earnings can be an accounting fiction,
masking the cash generated by a business or implying positive cash generation
when there is none. Today's investors have rightly concluded that following the
cash—as the manager of a business must do—is the most reliable and revealing
means of assessing a company.

Benjamin Graham & David L. Dodd, *Securities Analysis 6th Edition*, xxx (2008).

32.     The absence of free cash flow projections in the Proxy, but the inclusion of other

projections, renders statements made as to all financial projections misleading to shareholders.

"Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement

is to put all one's cards on the table face-up." *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121,

1125 (8th Cir. 2019) (citing *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990)). In this

case, only some of the cards were exposed—the others were concealed. If a proxy statement

discloses financial projections and valuation information, such projections must be complete and

accurate. This must be the case as financial projections may easily be manipulated in order to fit

a narrative. Consequently, regarding future events, uncertain figures, and other "soft"

information, a company may choose either to remain silent or speak with full and comprehensive

veracity—but it may not provide half-truths.

33.     Third, the Proxy describes Canaccord Genuity's fairness opinion and valuation

analyses performed in support of its opinion. Defendants concede the materiality of this

information in citing Canaccord Genuity's fairness opinion among the "material" factors the

Board considered in making its recommendation to the Company's shareholders. *See* Proxy at

47-48. However, the summary of Canaccord Genuity's fairness opinion and analyses fails to

include key inputs and assumptions underlying the analyses. Without this information, as

described below, Fibrocell's shareholders are unable to fully understand these analyses, and thus

are unable to determine what weight, if any, to place of Canaccord Genuity's fairness opinion in

10

determining how to vote on the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Fibrocell's shareholders.

34.     With respect to Canaccord Genuity's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in the analysis: (i) the actual and implied terminal values calculated; (ii) the inputs and assumptions underlying the calculation of the terminal perpetual growth range of 0% to 2.0%; (iii) the inputs and assumptions underlying the calculation of the discount rate range of 25.6% to 27.6%.  *See* Proxy at 55-56.

35.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow ("DCF") analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars… This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

36.     Without the above-mentioned information, Fibrocell's stockholders cannot

evaluate for themselves the reliability of Canaccord Genuity's *Discounted Cash Flow Analysis*, and make a meaningful determination of whether the illustrative implied per share equity value reference ranges reflect the true value of the Company or was the result of Canaccord Genuity's unreasonable judgment, and so cannot make an informed decision regarding whether to vote in favor of the Proposed Transaction.

37.    With respect to Canaccord Genuity's *Selected Public Companies Analysis*, the Proxy fails to disclose the individual valuation multiples Canaccord Genuity calculated for each of the companies considered in the analysis. *See* Proxy at 54. A fair summary of the *Selected Public Companies Analysis* requires the disclosure of the individual valuation multiples for each company utilized; even merely providing the low, high, mean, and median equity values that a banker calculated is insufficient, although not even that information was provided. The lack of disclosure is significant and alarming, the median of the data set was given as a value in the description of the analysis without any frame of reference to the data set. Without this information, stockholders are unable to assess whether Canaccord Genuity utilized reasonable comparable companies, or, instead, selected unreasonable companies in order to make the Merger Consideration appear more favorable. Thus, the individual multiples must be disclosed to correct the deficiencies in the Proxy.

38.    Similarly, with respect to Canaccord Genuity's *Selected Precedent Transactions Analysis*, the Proxy fails to disclose the individual valuation multiples Canaccord Genuity calculated for each of the companies considered in the analysis. *See id.* at 54-55. For the same reasons mentioned above, the failure to disclose the individual valuation multiples for each of the 8 transactions that were reviewed and analyzed renders the summary of the analysis materially incomplete and misleading. Additionally, the Proxy fails to disclose the assumptions

in choosing the specific precedent transactions and fails to provide information regarding their similarity. The failure to disclose such information further prevents Fibrocell's stockholders from evaluating for themselves the reliability of Canaccord Genuity's *Selected Precedent Transactions Analysis* and the fairness of the Merger Consideration, and whether to vote in favor of merger.

39.     With respect to the *Other Information* observed by Canaccord Genuity, the Proxy discloses the "premiums paid in 177 biopharmaceutical transactions with total transaction value greater than $10 million in the past five years based on information from the CapitalIQ database as of September 10, 2019." *Id.* at 56. However, while the mean and median values are disclosed, the low and high premiums are omitted. For the reasons stated above, this information is material to shareholders in evaluating the reliability of this information and so whether to vote in favor of the merger.

40.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9)**

41.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

43.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

44.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

45.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) critical financial projections, specifically the free cash flows for the Company; (ii) the valuation analyses performed by its financial advisor; and (iii) the substance of the confidentiality agreements disclosed in the *Background of the Merger.*

46.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but

14

failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

47.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Canaccord Genuity reviewed and discussed its financial analysis with the Board, and further states that the Board considered the financial analysis provided by Canaccord Genuity, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Canaccord Genuity's analysis in connection with their receipt of the fairness opinions, question Canaccord Genuity as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

48.     The Individual Defendants were, at the very least, negligent in preparing and

reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

49.    Fibrocell is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

50.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act)

51.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.    The Individual Defendants acted as controlling persons of Fibrocell within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Fibrocell, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and

control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

53. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

55. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons,

these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.    Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 18, 2019                    **MONTEVERDE & ASSOCIATES PC**

                                            */s/ Juan E. Monteverde*
                                            Juan E. Monteverde (JM-8169)
                                            The Empire State Building
                                            350 Fifth Avenue, Suite 4405
                                            New York, NY 10118
                                            Tel:(212) 971-1341
                                            Fax:(212) 202-7880
                                            Email: jmonteverde@monteverdelaw.com

                                            *Attorneys for Plaintiff*